Clarence **EISEN**, Plaintiff-Appellant,

v.

Oliver C. **EASTMAN**, Defendant-Appellee.

No. 16, Docket 32909.

United States Court of Appeals
Second Circuit.

Argued Oct. 17, 1969.

Decided Nov. 28, 1969.

Clarence Eisen, pro se.

Harry Michelson, New York City (Daniel W. Joy, Acting Gen. Counsel, Office of Rent Control, Dept. of Rent and Housing Maintenance, New York City Housing and Development Administration, New York City, of counsel), for defendant-appellee.

Before FRIENDLY, HAYS and ANDERSON, Circuit Judges.

FRIENDLY, Circuit Judge:

This action, brought by a landlord appearing *pro se*, is typical of the many cases in which, by virtue of a plaintiff's invocation of § 1 of the Civil Rights Act of 1871, 17 Stat. 13, now 42 U.S.C. § 1983, and its jurisdictional implementation, 28 U.S.C. § 1343(3), federal courts are now being asked to determine a great variety of controversies between city or state officials and citizens who prefer litigating in the federal courts to pursuing their state remedies.[1] The existing and pro-

1. Civil rights cases commenced in the district courts doubled from 1195 in the fiscal year 1967 to 2479 in the fiscal year 1969. Appeals likewise doubled, from 174 to 364. Administrative Office of the United States Courts, Ann.Rep.

spective importance of the problems thus presented has prompted us to examine them at greater length than disposition of this case might demand.

Eisen's one page *pro se* complaint against Eastman, a New York City District Rent and Rehabilitation Director, asserts that Eastman violated his constitutional right not to be deprived of property without due process of law by reducing the rents to which Eisen was restricted under the City's Rent and Rehabilitation Law, N.Y. City Adm. Code, Ch. 51, Title Y. The rent reductions in two buildings owned by the plaintiff had resulted in losses of some $1300 at the date of the defendant's *motion to dismiss* and of some $1800 at the time of the district court's decision. The complaint and other papers, when read with appropriate benevolence, challenge the rent control law, the general level of rents fixed for Eisen's buildings thereunder, and the Director's recent reductions, as violating plaintiff's rights under the due process clause of the Fourteenth Amendment.

The district judge held that the action could not be sustained under 42 U.S.C. § 1983, and its jurisdictional counterpart, 28 U.S.C. § 1343(3),[2] since the Civil Rights Act does not apply to suits

against municipalities. Monroe v. Pape, 365 U.S. 167, 187–192, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). He considered, however, that the showing that losses from the rent reductions would exceed $10,000 within an additional three years might satisfy the requirement of 28 U.S.C. § 1331. Proceeding to the merits, the judge held that the City's rent control statute was constitutional, citing Israel v. City Rent & Rehabilitation Administration, 285 F.Supp. 908 (S.D.N.Y. 1968), and that consequently the particular orders raised no federal question "in the absence of any allegations of extraordinary circumstances or arbitrary action." In his brief here Eastman contends that federal inquiry into the particular orders, and also, we should suppose, into the general rate level, was foreclosed by Eisen's failure to take the administrative appeal to the main office of the Rent Administration allowed by § Y51–8.0 of the Rent & Rehabilitation Law.

■ The district court's conclusion that the Civil Rights Act could not be invoked gets no support from the holding in Monroe v. Pape barring suits thereunder against municipalities. The action here was not against New York City but against Eastman. Actions against

---

of the Director, 1969, Tables II–22 and II–11. The figures do not permit a determination how many of these were what would have been regarded as "genuine" civil rights cases in an earlier day.

2. 42 U.S.C. § 1983, provides

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

28 U.S.C. § 1343(3) gives federal courts jurisdiction, without any requirement of amount, of any civil action authorized by law

To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

We have not here dealt with problems that may arise with respect to 28 U.S.C. § 1343(4), a subsection which was added by the Civil Rights Act of 1957 as "merely [a] technical [amendment] to the Judicial Code so as to conform it with amendments made to existing law by the preceding section of the bill," 1957 U.S.Code Cong. & Admin. News, p. 1976, but by its letter might be considerably more than that. See Jones v. Alfred H. Mayer Co., 392 U.S. 409, 412 n. 1, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); Allen v. State Board of Elections, 393 U.S. 544, 554, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).

a government official acting "under color of" statutes and ordinances are what 42 U.S.C. § 1983 is mainly about. Still it does not necessarily follow that 28 U.S.C. § 1343(3) covers an action such as this.

There has been no thorough discussion by the Supreme Court of the scope of 28 U.S.C. § 1343(3) since Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). Apart from its age, *Hague* casts an uncertain light because of the absence of a majority opinion. The lead opinion by Mr. Justice Roberts, joined on the jurisdictional aspect solely by Mr. Justice Black, who, as one will be pardoned for supposing, would scarcely take the same view today, held that the reference in the statute to "any right, privilege or immunity secured by the Constitution of the United States" only covered actions alleging violations of the clause in § 1 of the Fourteenth Amendment which says "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States," and was thus limited to the privileges and immunities of national citizenship—a requirement Justice Roberts thought satisfied by the individual plaintiffs since they were citizens complaining of abridgement of their right to disseminate information about the National Labor Relations Act. This interpretation of § 1343(3) encounters serious obstacles, both textual [3] and historical,[4] which are sketched in the margin, and was apparently rejected by all the Justices in Monroe v. Pape, 365 U.S. at 170–171, 81 S.Ct. 473 (majority opinion of Mr. Justice Douglas), 205–206, 81 S.Ct. 473 (dissenting opinion of Mr. Justice Frankfurter).[5]

3. The Civil Rights Act includes "rights" in addition to "privileges and immunities," see Monroe v. Pape, *supra*, 365 U.S. at 206 & n. 4, 81 S.Ct. 473 (dissenting opinion of Frankfurter, J.); but cf. United States v. Williams, 341 U.S. 70, 77–78, 71 S.Ct. 581, 585, 95 L.Ed. 758 (1951) (Frankfurter, J., construing "any right or privilege" secured by the Constitution to protect only "interests * * * arising from the relationship of the individual with the Federal Government"). The Act speaks of all rights, privileges and immunities "secured by the Constitution." And it applies not merely to a citizen of the United States but to any person within the jurisdiction of the state.

4. Without going into the congressional debates, which are discussed in Monroe v. Pape, *supra*, 365 U.S. at 173–183, 195–198, 225–234, 81 S.Ct. 473, and Note, Limiting the Section 1983 Action in the Wake of Monroe v. Pape, 82 Harv.L.Rev. 1486, 1491–92 (1969), it would be quite incredible, in light of history too well known to require recitation, that the framers of the Civil Rights Act of 1871, 17 Stat. 13, entitled "An Act to enforce the Provisions, of the Fourteenth Amendment to the Constitution of the United States, and for other purposes," did not mean to vest the federal courts with any jurisdiction over complaints of violation of civil rights guaranteed by the equal protection clause. Yet in 1871 there was no other way of gaining entry to the federal courts in such cases in the absence of diverse citizenship; general federal question jurisdiction was not conferred until 1875, 18 Stat. 470.

5. We say "apparently" because the Justices were focusing on the "rights, privileges, or immunities" language in 42 U.S.C. § 1983, rather than the identical words (in the singular) in its jurisdictional counterpart, 28 U.S.C. § 1343(3). However, we take their interpretation of the former as applying also to the latter.

Section 1 of the Civil Rights Act of 1871, 17 Stat. 13, is the common source of both statutes. The identical language "right * * * secured by the Constitution" in both was treated as having the same meaning in Carter v. Greenhow, 114 U.S. 317, 5 S.Ct. 928, 962, 29 L.Ed. 202, 207 (1885), and its companion case, Pleasants v. Greenhow, 114 U.S. 323, 330, 5 S.Ct. 931, 29 L.Ed. 204 (1885); and Holt v. Indiana Mfg. Co., 176 U.S. 68, 72, 20 S.Ct. 272, 44 L.Ed. 374 (1900), held that the predecessors of both § 1343(3) and § 1983 applied only to "civil rights." See text at notes 8–9 *infra*. Therefore, we read Justice Douglas' statement in *Monroe*, 365 U.S. at 170, 81 S.Ct. 473 that the "history of the section of the Civil Rights Act presently invoked [42 U.S.C. § 1983] does not permit such a narrow interpretation" as applying to 28 U.S.C. § 1343(3) as well. See McCall v. Shapiro, 416 F.2d 246 (2 Cir. 1969).

■ Mr. Justice Stone, joined by Mr. Justice Reed and apparently by Chief Justice Hughes, 307 U.S. at 518, 532,[6] 59 S.Ct. 954, sustained federal jurisdiction in *Hague* upon a different and more appealing view. Taking off from the seemingly unchallengeable but somewhat unilluminating statement in Holt v. Indiana Mfg. Co., 176 U.S. 68, 72, 20 S.Ct. 272, 44 L.Ed. 374 (1900), that the civil rights jurisdictional provision applied only to suits alleging deprivation of "civil rights," he stressed the incongruity of reading what is now 28 U.S.C. § 1343(3) so broadly that it would cover the entire ground later embraced by the present 28 U.S.C. § 1331, with its requirement of a jurisdictional amount, in all cases where natural persons complained of acts by state officers as violating the Constitution. Essaying the task of definition, which the Court had side-stepped in Pleasants v. Greenhow, 114 U.S. 323, 330, 5 S.Ct. 931, 29 L.Ed. 204 (1885), and Holt v. Indiana Mfg. Co., *supra*, he thought the special jurisdictional statute applied "whenever the right or immunity is one of personal liberty, not dependent for its existence upon the infringement of property rights." 307 U.S. at 531, 59 S.Ct. at 971.[7]

So far as our research has disclosed, Mr. Justice Stone's definition would encompass all the cases in which the Supreme Court has sustained jurisdiction under 28 U.S.C. § 1343(3), with the possible exception of King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), where the applicability of the Civil Rights Act was neither challenged nor discussed. Moreover, it is quite arguable that *King* came within Justice Stone's formulation on the basis that Alabama's "substitute father" regulation not merely caused economic loss to Mrs. Smith's children, but also infringed their "liberty" to grow up with financial aid for their subsistence and her "liberty" to have Mr. Williams visit her on weekends.

■ Like so many definitions, Justice Stone's has been considerably easier to state than to apply. Attacks on the constitutionality of state tax statutes rather plainly fall beyond it, and one of its virtues is in excluding them. See, e. g., Reiling v. Lacey, 93 F.Supp. 462 (D.Md. 1950), appeal dismissed, 341 U.S. 901, 71 S.Ct. 614, 95 L.Ed. 1341 (1951); Abernathy v. Carpenter, 208 F.Supp. 793 (W.D.Mo.1962) [alternative ground], aff'd, 373 U.S. 241, 83 S.Ct. 1295, 10 L.Ed.2d 409 (1963); Gray v. Morgan, 371 F.2d 172 (7 Cir. 1966), cert. denied, 386 U.S. 1033, 87 S.Ct. 1484, 18 L.Ed. 2d 596 (1967); Bussie v. Long, 383 F.2d 766 (5 Cir. 1967); Hornbeak v. Hamm, 283 F.Supp. 549 (M.D.Ala.), aff'd, 393 U.S. 9, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968). So also does an action addressed solely to the taking of property. Ream v. Handley, 359 F.2d 728 (7 Cir. 1966); Howard v. Higgins, 379 F.2d 227 (10 Cir. 1967). At the other end of the spectrum, cases involving, e. g., the right to distribute literature free of a municipal license tax, Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943); the right to vote and to have an equal effect given to one's vote, Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); Baker v. Carr, 369 U.S. 186, 200 & n. 19, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); the right to freedom of speech and of petition for the redress of grievances, Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); the right to be free from unreasonable searches and arrests, Monroe v. Pape, *supra*, 365 U.S. 167, 81 S.Ct.

---

6. Justices McReynolds and Butler dissented on the merits; Justices Frankfurter and Douglas did not participate.

7. We believe Justice Stone's formulation is to be found in this phrase rather than in his earlier statement that jurisdiction under the predecessor of 28 U.S.C. § 1343(3) "*at least* must be deemed to include suits in which the subject matter is one incapable of valuation." 307 U.S. at 530, 59 S.Ct. at 971 (emphasis supplied). Cases of that type would almost necessarily come within the broader test. See Hart & Wechsler, The Federal Courts and the Federal System 841 (1953); D. Currie, Federal Courts 428 (1968).

473; and the right to attend an integrated school, McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed. 2d 622 (1963), fit snugly under the Stone formula. Greater difficulty has been experienced with cases involving denials or revocations of licenses or discharges from public employment. These can be viewed about equally well as complaining of a deprivation of the personal liberty to pursue a calling of one's choice or of the profits or emoluments deriving therefrom. See Glicker v. Michigan Liquor Control Comm'n, 160 F.2d 96 (6 Cir. 1947); Hornsby v. Allen, 326 F.2d 605 (5 Cir. 1964), other cases cited in Hart & Wechsler, The Federal Courts and the Federal System 842 (1953), and in D. Currie, Federal Courts 428–29 (1968); and the recent decision in Berry v. Allen, 411 F.2d 1142 (6 Cir. 1969).[8]

This circuit has not squarely faced the issue. See American Commuters Ass'n v. Levitt, 405 F.2d 1148, 1151 n. 4 (2 Cir. 1969). In Burt v. City of New York, 156 F.2d 791 (2 Cir. 1946), this court upheld civil rights jurisdiction over an architect's damage action against city building officials for purposeful discrimination in rejecting his applications or imposing upon him unlawful conditions while not doing so to others. This would be reconcilable with the Stone formulation on the basis indicated above, as are Birnbaum v. Trussell, 371 F.2d 672, 676–677 (2 Cir. 1966), and Holmes v. New York City Housing Authority, 398 F.2d 262 (2 Cir. 1968). On the other hand, Powell v. Workmen's Compensation Board, 327 F.2d 131 (2 Cir. 1964), involved only deprivation of property. After stating that § 1983 "has been broadly interpreted as covering any right protected through the Fourteenth Amendment, and not simply those rights existing by virtue of the amendment's privileges and immunities clause," the court found it unnecessary to determine the section's applicability to the claim at issue, 327 F.2d at 136–137. Departure from Mr. Justice Stone's interpretation could scarcely have been intended since his opinion in *Hague* was cited as authority for the statement just quoted. Quite recently a panel including the writer of the *Powell* opinion affirmed the continuing vitality of the Stone formulation in McCall v. Shapiro, 416 F.2d 246 (1969), although the precise issue determined seems rather to have been that in a case of claimed conflict with a federal *statute*, the narrower words of the jurisdictional provision, "any Act of Congress providing for equal rights" prevail over the broader language of 42 U.S.C. § 1983. But see Bomar v. Keyes, 162 F.2d 136 (2 Cir.), cert. denied, 332 U.S. 825, 68 S.Ct. 166, 92 L.Ed. 400 (1947), and the criticism of that decision in Note, The Civil Rights Act and Mr. Monroe, 49 Calif.L.Rev. 145, 150–51 (1961).

We must confess we are not altogether clear just where this leaves us. Although Mr. Justice Stone's construction has been severely criticized, notably in Note, The Proper Scope of the Civil Rights Act, 66 Harv.L.Rev. 1285, 1289–91 (1953), there seems to be something essentially right about it, especially if one accepts, as we do, his premise that the overlap between 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3) should be explained in some rational way. It has the merit of preserving not only the kind of case that was at the core of congressional concern in 1871 but a good many others

8. We note that in many of the cases just cited, and in some of those cited in the next paragraph in the text, attention is devoted only to 42 U.S.C. § 1983, or, if 28 U.S.C. § 1343(3) is referred to at all, the reference is merely in the proposition that if there is a cause of action under § 1983, there is jurisdiction under § 1343(3). Hornsby v. Allen, *supra*, 326 F.2d 605, is a prime example. While this treatment accords with our view that in cases alleging constitutional deprivations both sections are subject to the same interpretation, see note 5, *supra*, one cannot help forming the impression that the focus on § 1983—and the neglect of § 1343(3)—has contributed to the failure to deal with *Hague's* interpretation of the latter section and, in some cases, the failure even to mention that decision at all.

that Congress would probably desire to have within the statute, while at the same time excluding cases that neither the Reconstruction Congress nor later Congresses could really have had in mind. It is quite hard to believe, for example, that the framers either of § 1 of the Civil Rights Act of 1871 or of its successors would have thought the statute could be invoked by a person complaining of state taxes allegedly barred by the Commerce Clause. Moreover, Carter v. Greenhow, 114 U.S. 317, 5 S.Ct. 928, 962, 29 L.Ed. 202, 207 (1885); Pleasants v. Greenhow, *supra*, 114 U.S. 323, 330, 5 S.Ct. 931, 29 L.Ed. 204; and Holt v. Indiana Mfg. Co., *supra*, 176 U.S. 68, 20 S.Ct. 272, 44 L.Ed. 374, are still on the books, and a reading that would push 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3) to the full extent of their language must either overrule those cases, which we surely cannot, or propound a basis for distinction that is not plain to us.[9] Also the language in *Holt* that the present 42 U.S.C. § 1983 speaks only to "civil rights" was recently echoed in Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), both in Chief Justice Warren's opinion for the majority, 386 U.S. at 554, 87 S.Ct. 1213, and by Mr. Justice Douglas in dissent, 386 U.S. at 563, 87 S.Ct. 1213. We therefore hold, although with a good deal less than complete assurance, that Justice Stone's *Hague* formulation, generously construed, should continue to be regarded as the law of this circuit.[10] Since the complaint here alleged only the loss of money, the district court's conclusion that jurisdiction under the Civil Rights Act was not established, although predicated on a wrong reason, was thus correct.

■ The same is true with respect to the court's holding that the complaint satisfied the $10,000 jurisdictional amount requirement of 28 U.S.C. § 1331. If jurisdiction were sought to be grounded on the amount of future payments, we would encounter the difficulty that "the rule apparently is that only the amount of the installments due at the commencement of the suit may be taken into account, even though the judgment will be determinative of liability for future installments as they accrue." Wright, Federal Courts 97, citing New York Life Ins. Co. v. Viglas, 297 U.S. 672, 56 S.Ct. 615, 80 L.Ed. 971 (1936) and other cases. But the complaint can be considered as putting in controversy the value of the two buildings free from rent control as against being bound by it, or at least their value before and after the rent reduction orders. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); Kroger Grocery & Baking Co.

9. One basis for distinction might be that, taking note of the title of the Act of April 20, 1871, and the circumstances under which it was passed, "secured by the Constitution" means "secured by the post-Civil War Amendments." But that would be too tall a piece of construction for an inferior federal court. See Lane v. Wilson, 307 U.S. 268, 273, 59 S.Ct. 872, 83 L.Ed. 1281 (1939) (the Civil Rights Act of 1871 is " 'appropriate legislation' of Congress to enforce the *Fifteenth* Amendment" [emphasis added]).

10. The chief disadvantage we perceive in adhering to Justice Stone's formula is that it apparently would bar from the federal courts actions alleging the unconstitutionality of a state's handling of a welfare plan where the plaintiff could neither show an infringement of personal liberty or violation of "any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States," 28 U.S.C. § 1343(3), nor meet the $10,000 jurisdictional amount required by 28 U.S. C. § 1331. See Rosado v. Wyman, 414 F.2d 170, 175–178 (2 Cir. 1969).

The issue would cease to have importance as regards access to the federal courts if Congress should adopt the proposal of the American Law Institute to abolish any requirement of jurisdictional amount in federal question cases, thereby permitting repeal of 28 U.S.C. § 1343. See ALI, Study of the Division of Jurisdiction between State and Federal Courts 24–25, 172–76 (1969). However, the problems of the substantive scope of 42 U.S.C. § 1983 and of the need for exhausting state remedies in case of violation would remain.

v. Lutz, 299 U.S. 300, 57 S.Ct. 215, 81 L.Ed. 251 (1936). The capitalized amount of the rent reductions was clearly in excess of $10,000. We therefore turn to the merits.

 The constitutionality of rent control legislation seems not to have been directly passed upon by the Supreme Court since the cases arising during World War II and the housing shortage consequent thereon. Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944); Woods, Housing Expediter v. Cloyd W. Miller Co., 333 U.S. 138, 68 S.Ct. 421, 92 L.Ed. 596 (1948). While in those cases the Court naturally stressed the war and post-war emergencies, we have no doubt that it would sustain the validity of rent control today. The New York City Rent Control Law contains an impressive recital of the conditions deemed to call for its enactment, Adm. Code of the City of New York § Y51–1.0. The time when extraordinarily exigent circumstances were required to justify price control outside the traditional public utility areas passed on the day that Nebbia v. New York, 291 U.S. 502, 539, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469 (1934), was decided. Whether, as some believe, rent control does not prolong the very condition that gave it birth, is a policy issue not appropriate for judicial concern.

 Plaintiff's memorandum on appeal also alleges both that before the recent reduction the City had kept his rents "down to the level of the depression years when maintenance costs were extremely cheap in comparison with highly inflationary maintenance costs of today" and that the rent reductions, made because of failure to furnish essential services, related to "trivial" matters, such as the bell and buzzer system and the dumb-waiter ropes, which, he claims, the tenants put out of order in an effort to obtain rent reductions. Assuming that these points were put to the district court, as may be gathered from its opinion although the skimpy record does not permit verification, we agree that the attack upon the rent reduction orders did not advance a claim of constitutional magnitude with sufficient specificity to withstand Eastman's affidavit concerning the regularity of the rent reduction proceedings, even when Eisen's papers are treated with the liberality appropriate in the case of a *pro se* litigant. The same may well be true of his claim that the rents were too low even before the reductions. However, a much more satisfactory ground for rejecting both claims, if it is available, would lie in Eisen's failure to pursue the administrative remedy of a protest to the main office of the Rent Administration permitted by § Y51–8.0 of the Rent & Rehabilitation Law. We have had occasion to see only this year how effective this procedure can be. See Mkwanazi v. Kenray Associates, 410 F.2d 1143, 1144 (2 Cir. 1969).

 Until quite recently the accepted learning had been that a plaintiff complaining to a federal court of the violation of a constitutionally protected right by a state officer must exhaust state administrative remedies although not judicial ones. Contrast Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908), with Bacon v. Rutland R. R., 232 U.S. 134, 34 S.Ct. 283, 58 L.Ed. 538 (1914), both written by Mr. Justice Holmes, and see Wright, Federal Courts § 49. The considerations supporting the requirement for exhaustion of state administrative remedies have been well summarized in a recent law review note which we set forth in the margin.[11] However, four recent decisions of

11. Note, Exhaustion of State Remedies under the Civil Rights Act, 68 Colum. L.Rev. 1201, 1206 (1968).

A strong state interest is reflected in the establishment of a comprehensive scheme of regulation; authority over the subject matter of the dispute has been vested in an expert supervisory body, far more familiar than a federal court with local factors that legitimately affect administration. Moreover, the states, as well as the federal

the Supreme Court have been thought to cast serious doubt on the applicability of this important principle in cases brought under the Civil Rights Act. Although we have held above that Eisen cannot predicate jurisdiction upon that Act, thereby precluding reliance upon 42 U.S.C. § 1983 even though the requirements of 28 U.S.C. § 1331 have been met, [12] we entertain sufficient doubt on that score that we think it necessary to assay those decisions. With the breadth the Civil Rights Act has even under Mr. Justice Stone's formulation, let alone what it would have under the broader construction that may well be adopted, the consequences of compelling federal courts to pass upon all complaints of unconstitutional acts by state and local officials at the lowest level, without any requirement of appeal to higher ones,[13] would be so destructive of proper concepts of federalism and so needlessly burdensome to the federal courts that it is appropriate to examine whether the decisions have not been given a greater sweep than the Court intended.

The first of the four, McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), was a desegregation case. The Illinois administrative remedy to which the Court first turned its attention was this: Fifty residents of a school district or 10% whichever was less, could file a complaint with the Superintendent of Public Institutions alleging racial segregation. He would then put this down for hearing. If he decided that the allegations were "substantially correct," he would then *request* the Illinois Attorney General to bring suit. The bulk of the opinion was devoted to demonstrating that this did not qualify as an effective administrative remedy. Apart from the plaintiff's problem of getting other signers, the Superintendent himself could give no relief; the most he could do was seek action from the Attorney General. Even if the Attorney General heeded the request, the true remedy would be not administrative but judicial and, as indicated above, the Court had long held that the mere availability of a state judicial remedy did not bar resort to the federal courts, whether under the Civil Rights Act or otherwise.[14] In a concluding paragraph the Court took note of another alleged state remedy: a school district might not file a claim for state aid unless it had previously filed with the Superintendent a statement of compliance with constitutional and statutory provisions outlawing segregation. Defendants contended that the Superintendent would not certify a district for state aid if he found the statement false. The Court answered that no Illinois case had ever held this, and that "In any event, the withholding of state aid is at best only an indirect sanction of Fourteenth Amendment rights. When federal rights are subject to such tenuous protection, prior resort to a state proceeding is not necessary," 373 U.S. at 676, 83 S.Ct. at 1438. We find little basis in this for the view, taken by many courts and commentators, see Note, Exhaustion of State Remedies under the Civil Rights Act, *supra*, 68 Colum.L.Rev. at 1203 & n. 15,

government have an interest in providing a means whereby official abuse can be corrected without resort to lengthy and costly trial. Thus, the same considerations which support an exhaustion requirement in suits against a federal agency in federal court or a state agency in state court are relevant.

12. See note 5 *supra*.

13. Initial denial, suspension or revocation of all kinds of licenses ranging from automobile drivers through liquor licensees to accountants, doctors and lawyers, and the imposition of terms on or the refusal of building permits or applications for changes in zoning are sufficient examples.

14. See, in addition to the cases cited above, Lane v. Wilson, *supra*, 307 U.S. 268, 274–275, 59 S.Ct. 872, 83 L.Ed. 1281, where, however, the Court assumed that a plaintiff under the Civil Rights Act must exhaust state *administrative* remedies as did the House Committee's report on the 1957 Civil Rights Act, 1957 U.S.Code Cong. & Admin.News, p. 1975.

that *McNeese* abolished the requirement of exhaustion of adequate state administrative remedies in all cases brought under the successor to § 1 of the Civil Rights Act of 1871. The Court held only that there was no administrative remedy by which plaintiffs could have any assurance of getting the relief they wanted—an end to segregation—even if they were clearly entitled to it.

The three other cases are Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); King v. Smith, *supra*, 392 U.S. at 312, n. 4, 88 S.Ct. 2128; and Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968). *Damico* was a per curiam opinion rendered on a jurisdictional statement and a motion to dismiss. The Court quoted *McNeese* as holding, 373 U.S. at 671, 83 S.Ct. at 1435, that "relief under the Civil Rights Act may not be defeated because relief was not first sought under state law which provided [an administrative] remedy" (brackets in original), and then cited Monroe v. Pape, 365 U.S. 167, 180–183, 81 S.Ct. 473. But the portion of the *McNeese* opinion that was quoted dealt with a state judicial, not administrative remedy, as Monroe v. Pape also had done. The answer, we think, can be found in the later statement in King v. Smith, citing *Damico*, that a plaintiff in an action under the Civil Rights Act "is not required to exhaust administrative remedies, where the constitutional challenge is sufficiently substantial, as here, to require the convening of a three-judge court." 392 U.S. at 312 n. 4, 88 S.Ct. at 2131. Insofar as *Damico's* complaint attacked the *constitutionality* of the California law postponing AFDC aid for three months after desertion by or separation from the father unless a suit for divorce had been filed, it is hard to see what an administrative hearing could have accomplished; the California relief agency could not declare the state statute unconstitutional. While King v. Smith involved a state regulation rather than a statute, it was also exceedingly unlikely that an administrative hearing would produce a change.[15] Finally in Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968), the complaint concerned prison rules that the attorney general of the state submitted had been "validly and correctly applied to petitioner." Under such circumstances to compel resort to an administrative remedy culminating in an appeal to that very officer "would be to demand a futile act." 392 U.S. at 640, 88 S.Ct. at 2120.

Despite the breadth of some of the language, particularly in the *Damico* per curiam, we thus read these decisions as simply condemning a wooden application of the exhaustion doctrine in cases under the Civil Rights Act. Exhaustion of state administrative remedies is not required where the administrative remedy is inadequate, as in *McNeese,* or where it is certainly or probably futile, as in *Damico, Smith* and *Houghton.* A quite different situation would be presented, for example, when a complaint alleged that a subordinate state officer had violated the plaintiff's constitutional rights by acting because of bias or other inadmissible reasons, by distorting or ignoring the facts, or by failing to apply a constitutional state standard, and the state has provided for a speedy appeal to a higher administrative officer, as New York City has done here. We shall need much clearer directions than the Court has yet given or, we believe, will give, before we hold that plaintiffs in such cases may turn their backs on state administrative remedies and rush into a federal forum, whether their actions fall under the Civil Rights Act or come under general federal question jurisdiction.

Affirmed.

15. See Note, Federal Judicial Review of State Welfare Practices, 67 Colum.L.Rev. 84, 103–106 (1967).