Edward SMITH, Plaintiff,

v.

Hugh CAREY, Individually and as Governor of the State of New York, Benjamin Ward, Individually and as Commissioner of Correctional Services of the State of New York, Security Unit Employees Council 82, American Federation of State, County and Municipal Employees, AFL–CIO, Donald Wollett, Individually and as Director of Employee Relations of the State of New York, John Burns, Individually and as Director, Bureau of Labor Relations, Department of Correctional Services of the State of New York, Henry Bankhead, Individually and as Director of Personnel, Department of Correctional Services, State of New York, John Van De Car, Individually and as Director of Manpower and Employee Relations, Department of Correctional Services, State of New York, Defendants.

No. 76 Civ. 767 (CHT).

United States District Court,
S. D. New York.

July 10, 1979.

Harlem Assertion of Rights, Inc., New York City, for plaintiff; James N. Finney, Dwight W. Loines, New York City, of counsel.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for New York State defendants; Lillian Z. Cohen, Asst. Atty. Gen., New York City, of counsel.

Rowley & Forrest, Albany, N. Y., for Union; Richard R. Rowley, Albany, N. Y., of counsel.

## OPINION

TENNEY, District Judge.

Edward Smith, a black man, was suspended and subsequently dismissed from his tenured job as a New York State Corrections Officer assigned to Green Haven Correctional Facility in Stormville, New York. His employer, the New York State Department of Correctional Services ("DCS") imposed the suspension on April 16, 1975, pursuant to Article 8.4A(2) of an agreement ("Collective Bargaining Agreement") between it and the plaintiff's union, Security and Law Enforcement Council 82, American Federation of State, County and Municipal Employees, AFL–CIO, a unit of corrections officers, *i. e.,* prison guards, and other peace officers ("the Union"). Article 8.4 is entitled "Suspension Before Notice of Discipline." Subsection A(2) provides in pertinent part

> [t]hat appointing authority or his designee may with agency approval suspend without pay an employee charged with the commission of a crime. Such employee shall notify his appointing authority in writing of the disposition of any criminal charge including a certified copy of such disposition within five days thereof. Within 30 calendar days following such suspension under this provision . . , a notice of discipline shall be served on such employee or he shall be reinstated with back pay.

Collective Bargaining Agreement, Exh. A to Union Statement submitted pursuant to Rule 9(g) of the General Rules of the Southern District of New York. Smith's suspen-

sion was triggered by his arrest in New York City on charges of committing the crime of public lewdness, N.Y. Penal Law § 245.00.

On May 16, 1975, the DCS sent Smith a Notice of Discipline, which informed him that

> [p]ursuant to Article 8, Security Services Union 1974–1977 Agreement between the State of New York and Council 82, AFSCME, you are hereby informed that we propose to implement the following penalty:
>
> ### DISMISSAL FROM SERVICE ·
>
> \*    \*    \*    \*    \*    \*
>
> If you believe that this discipline is not for just cause or that the penalty is excessive, *you must file a disciplinary grievance with me postmarked no later than fourteen calendar days from the receipt of this notice. Unless such a grievance is filed, the penalty will be imposed at the close of the appeal period, and the matter may not otherwise be reviewed.*
>
> You are provided two copies of this notice in order that one may be given to your representative. Your union representative is Council 82, AFSCME.

Brief for Union at 3–4 (emphasis added). Smith never filed a grievance or inquired about the procedure for doing so.[1] His communications with the DCS, certain phone calls and letters to officials, occurred after his dismissal became final. · When the public lewdness charges against Smith were later dropped after the complainant failed to appear, Smith sent the DCS a "Certification of Disposition" stating that fact. He

also sent a letter requesting reinstatement; it was denied.

Thereafter Smith brought this suit charging that the suspension and termination procedures sanctioned in the Collective Bargaining Agreement between the Union and the DCS violate his constitutional rights. He urges that the power to suspend without pay prior to a hearing offends due process; that the summary suspension procedure for criminal charges infringes equal protection guarantees because they have a disproportionate effect on blacks who, plaintiff claims, are arrested more frequently than whites; that mere criminal charges should not constitute just cause for suspension and termination; and that the Union violated its duty of fair representation because, *inter alia*, it entered the Collective Bargaining Agreement with the state. Smith seeks reinstatement to his former job, back pay, and appropriate seniority and a judgment declaring, first, that Article 8.4A(2) of the Collective Bargaining Agreement is null and void; second, that Smith was suspended without cause; and third, that the agreement had an adverse and disparate impact on blacks. Smith also asks for a permanent injunction against proceeding under Article 8.4A(2) and for one million dollars in damages. Both sides have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, judgment is awarded to the defendants.

### Discussion

The defendant Union and the state-related defendants have marshalled numerous arguments in support of their position that Smith's claim is meritless. For the sake of

---

1. In his deposition testimony, Smith recalled that on the day after he was arrested he called Green Haven Correctional Facility, spoke to a member of the personnel staff, and was told that he was suspended until further notice. He stated that he received written confirmation of his suspension, and that there was "no question" that he knew that his suspension was directly related to his arrest. He acknowledged receipt of the formal Notice of Discipline the next month, stated that it contained a reference to the charges against him, and, upon being asked if the Notice of Discipline told him what procedure to follow, replied: "It said something like, if you don't think this is fair, that I should make a repeal [sic] within fourteen calendar days." Deposition of Edward Smith, taken March 23, 1978, at 37, Exh. D to defendant Union's Notice of Motion. The reason Smith did not follow the procedure mandated in the Notice of Discipline was that he was "under the impression that after everything was finished in court, if everything worked out, [he] would be reinstated." He admitted that this was something he "assumed." *Id.* at 39.

clarity, the Court will attend to them one by one.[2]

*Due Process Claim*

■ Smith complains that the suspension procedure agreed upon by the Union and the DCS in Article 8.4 of the Collective Bargaining Agreement offends due process because it fails to provide for a hearing prior to suspension without pay. Smith contends that the necessity for presuspension hearings was endorsed by a "majority of six of the justices" expressing opinion in *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). Plaintiff's Memorandum at 14. That reading of *Arnett* is simply wrong.[3] In *Arnett* the plaintiff complained that he was deprived of due process when he was dismissed from his tenured position in the Federal Civil Service without a preremoval hearing. His employment was governed by a statute which provided that employees could be removed only for such cause as would promote the efficiency of the service. The statute outlined specific notice and protest procedures, but explicitly stated that no hearing was required (although the agency involved in the case had provided for a posttermination evidentiary trial-type hearing at the appeal

---

**2.** Beyond the arguments dealt with in the text *infra*, the defendants have also suggested that this case cannot be heard because the plaintiff has failed to exhaust his administrative remedies. The question whether administrative, as opposed to judicial, exhaustion may be required in a section 1983 context is still an open one in this circuit. In *Eisen v. Eastman*, 421 F.2d 560 (2d Cir. 1969), *cert. denied*, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 (1970), the court discussed the effect of four Supreme Court cases on the historical wisdom that a plaintiff complaining to a federal court of the violation of a constitutionally protected right by a state officer must exhaust state administrative remedies, although not judicial ones, because administrative remedies offer a comprehensive scheme of regulation, the expertise of the administrative body, and a more economical correction of official abuse than judicial litigation. Reviewing *McNeese v. Board of Education*, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *Houghton v. Schafer*, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); and *Damico v. California*, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967), all of which held for one reason or another that administrative exhaustion was not required on the facts, the *Eisen* court concluded that "[e]xhaustion of state administrative remedies is not required where the administrative remedy is inadequate, as in *McNeese*, or where it is certainly or probably futile, as in *Damico, Smith* and *Houghton*," but there exists no hard and fast rule other than the prohibition of "a wooden application of the exhaustion doctrine in cases under the Civil Rights Act." *Eisen, supra*, 421 F.2d at 569.

In *Plano v. Baker*, 504 F.2d 595 (2d Cir. 1974), the Second Circuit had an opportunity to comment further on the vitality of the administrative exhaustion doctrine, hewing to its view that it might be required in some section 1983 cases, but stating that the *Plano* facts argued for a finding that the administrative remedy was inadequate and need not have been exhausted. *Inter alia* the *Plano* court cautioned that where the only thing militating against the application of the exhaustion rule is whether the administrator could grant all the relief sought, *e. g.,* damages, declaratory relief, etc., "the complaint should be carefully scrutinized to ensure that the claim for relief was not inserted for the sole purpose of avoiding the exhaustion rule." *Id.* at 599.

Because the constitutional claim in this action is so insubstantial, the Court need not decide whether Smith should be dismissed for failure to exhaust despite his forfeiture of administrative remedies. *See Kuhn v. National Ass'n of Letter Carriers*, 528 F.2d 767, 771 (8th Cir. 1976) (fact that plaintiff was denied administrative hearing because of late filings is no bar to exhaustion rule); *cf. Mills v. Long Island Rail Road Co.*, 515 F.2d 181 (2d Cir. 1975) (where employee made good faith attempt to have union represent him in administrative grievance procedure, but union failed to do so, employee excused from administrative exhaustion requirement). The Court would only add that the insubstantiality of this constitutional claim raises the spectre that Smith adopted a constitutional attack because it was the only remaining way to review his suspension and termination after he burned his administrative bridges.

**3.** "The clear import of *Arnett* and the recent case of *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) is that there is no right to pre-termination constitutional protection." *Bullock v. Mumford*, 166 U.S.App. D.C. 51, 56, 509 F.2d 384, 389 (1974) (denial of petition for rehearing or rehearing en banc) (Bazelon, J.).

In *Sampson* the Court held that a district court may not, except in an extraordinary case, issue a temporary injunction for the retention of a discharged probationary employee who refused to proceed with a posttermination administrative hearing on the grounds that the agency did not intend to follow its own procedure.

stage with provision for reinstatement and full back pay upon vindication).

Three justices in *Arnett* concluded that the statute under which that plaintiff was hired governed his employment exclusively and foreclosed his request for constitutional due process. They held that the employee had no valid, independently protectable entitlement to his employment because "the property interest which [he] had in his employment was itself conditioned by the procedural limitations which had accompanied the grant of that interest." *Id.*, 416 U.S. at 155, 94 S.Ct. at 1645. The remaining six Justices disagreed with that view of the employee's property interest in his work, finding it at odds with *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), and *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), which, taken together, illustrate how a legitimate claim of entitlement to employment and a corresponding entitlement to due process may arise. However, while the *Arnett* majority found a *Roth/Sindermann* property interest, that majority did not, as this plaintiff asserts, determine that "notice and a hearing of some type [is] required prior to the temporary loss of employment." Plaintiff's Brief at 14. The three Justices who found in *Arnett* no protectable property interest in employment a fortiori concluded that no pretermination hearing was required for divestment of that employment. Justices Powell and Blackmun, concurring in part with the plurality opinion and in part in the result, concluded that a valid property interest in employment was present and that due process applied, but that the decision vel non to afford a pretermination hearing depended upon a "balancing process in which the Government's interest in expeditious removal of an unsatisfactory employee is weighed against the interest of the affected employee in continued public employment." *Id.*, 416 U.S. at 167–68, 94 S.Ct. at 1651. On the *Arnett* facts they concluded that a prior evidentiary hearing was not necessary. *Id.* at 171, 94 S.Ct. 1633.

Justice White, who concurred in part and dissented in part, also concluded that the *Arnett* plaintiff had a protectable property interest in retaining his job and was entitled to "some kind of hearing . . . at some time before [he] is finally deprived of his property interests." *Id.* at 178, 94 S.Ct. at 1656. Justice White thought that some type of pretrial hearing should occur, although not necessarily one involving the full panoply of trial procedures. However, he also recognized that a notice requirement prior to termination may be dispensed with in some circumstances, *e. g.*, when "there is reasonable cause to believe an employee is guilty of a crime for which a sentence of imprisonment can be imposed." *Id.* at 195, 94 S.Ct. at 1664, *citing* 5 C.F.R. § 752.202(c)(2) (1972). Justices Douglas, Marshall and Brennan dissented completely. They found a protectable property interest in the employee and, after balancing the needs of the Government against those of the discharged employee, found a duty to hold an evidentiary hearing before job termination.

Two years after *Arnett* in *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), a majority of five held that a discharged state employee did not have a constitutional right to a pretermination hearing where the statute creating his employment had been construed by a state court as not having created an entitlement. The majority once again acknowledged that a property interest in employment may be created by law or implied contract, but also reaffirmed that "[i]n either case . . . the sufficiency of the claim of entitlement must be decided by reference to state law." *Id.* at 344, 96 S.Ct. at 2077. As the defendants in this case point out, the suspension procedure in this Collective Bargaining Agreement is a variant of—and supersedes as between the Union and the DCS—New York Civil Service Law § 75(3). *See Antinore v. State*, 49 A.D.2d 6, 371 N.Y.S.2d 213 (4th Dep't 1975), *aff'd on opinion below*, 40 N.Y.2d 921, 389 N.Y.S.2d 576, 358 N.E.2d 268 (1976). Section 75(3) provides, *inter alia*, that

[p]ending the hearing and determination of charges of incompetency or miscon-

duct, the officer or employee against whom such charges have been preferred may be suspended without pay for a period not exceeding thirty days.

The Union asserts, and the plaintiff does not dispute, that Article 8.4(A)(2) was part of the collective bargaining accommodation reached by it and the DCS. The latter was apparently eager to have in the contract specific language regarding suspension of corrections officers charged with criminal acts. Because Council 82 members are "peace officers" within N.Y. Criminal Procedure Law § 1.20(33)(h), they are entitled thereby to carry firearms and other weapons, N.Y. Penal Law § 265.20(a)(1)(a), and may physically detain and arrest persons under a broader range of circumstances than may private citizens. Criminal Procedure Law § 140.25. According to the Union, the quid pro quo for agreeing to the summary suspension of employees charged with criminal conduct was the text of Article 8.4A(1), a provision which parallels Civil Service Law § 75(3) but limits the suspension provision to those situations where there is probable cause to believe that the employee's "continued presence on the job represents a potential danger to persons or property or would severely interfere with [the appointing authority's] operations." Collective Bargaining Agreement, Article 8.4A(1). By contrast, the less protective section 75(3) permits suspension without pay for 30 days pending the hearing and determination of charges of "incompetency or misconduct," far broader "cause" for suspension than what is permitted in Article 8.4A(1). Section 75(3) also lacks the Article 8.4A(1) "probability" safeguard.

Notably, the constitutionality of the more sweeping section 75(3) has been upheld. In *McIntyre v. New York City Department of Correction*, 411 F.Supp. 1257 (S.D.N.Y.1976), a group of corrections officers unsuccessfully challenged the summary suspension procedure in section 75(3). The *McIntyre* court held that the disciplinary procedure afforded the employee provided ample safeguards before permanent deprivation of employment and that suspension was not that final deprivation such that due process safeguards were necessary prior to suspension. *Inter alia* the court noted that

the ability to suspend a public employee who is charged with misconduct or incompetence, especially one who occupies the sensitive and demanding position of corrections officer, is a reasonable and practical means of promoting the general discipline and efficiency of the civil service.

*Id.* at 1260. This Court agrees that it is reasonable for an agency charged with the management of prisons and prisoners to be able to suspend a corrections officer who has been charged with a crime, a crime that perhaps, although not in this case, is more serious than the conduct of the prisoners he attends.

Finally, Smith's claim of deprivation of due process because of the very existence of a summary suspension procedure smacks more of a substantive due process complaint than of a procedural one. Although he is ostensibly challenging the lack of a presuspension hearing, his claim does not rest on his inability to place disputed facts on the record before an impartial tribunal. Instead he quarrels with a procedure directly derivative of a legislative determination by the State of New York that certain employees who are charged with crimes must be removed from their posts until they are no longer tainted by criminality. There is, in truth, no issue of fact whatsoever in this matter, and that circumstance seems to put the question of a hearing outside the principle that "where government action seriously injures an individual, *and the reasonableness of the action depends on fact findings*, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Greene v. McElroy*, 360 U.S. 474, 496–97, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959), *quoted with approval in Goldberg v. Kelly*, 397 U.S. 254, 270, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (emphasis added). Furthermore, to the extent that this plaintiff only challenges the right of the State to manage prisons and prison discipline in a way that encroaches on his

absolute freedom of action, he also runs afoul of the rule that "[s]tate legislation which has some effect on individual liberty or privacy may not be held unconstitutional simply because a court finds it unnecessary, in whole or in part," for "we have frequently recognized that individual States have broad latitude in experimenting with possible solutions to problems of vital local concern." *Whalen v. Roe,* 429 U.S. 589, 597, 97 S.Ct. 869, 875, 51 L.Ed.2d 64 (1977).

The Court concludes that the plaintiff's due process claims are lacking in merit. He has only himself to blame for missing the opportunity to defend himself through the entirely adequate grievance procedure afforded by the Collective Bargaining Agreement between the Union and the DCS.

*Equal Protection Claim*

█ Although Smith has invoked the jurisdiction of this Court to determine "whether the [Collective Bargaining] Agreement has an adverse disparate impact on blacks," Complaint ¶ IV, he does not pursue this equal protection claim in support of his cross-motion for summary judgment or in rebuttal to the arguments for dismissal raised by the defendants. For example, the Union argues vigorously that there is "no evidence on the record that black persons in general, or black members of the Security Services Unit in particular, are arrested more frequently than their white counterparts." Union Brief at 9. The Union also argues that even if statistics were to show, arguendo, that blacks were disproportionately injured by the Article 8.4A(2) suspensions, the Union's activity in negotiating the suspension provision with the State has nothing to do with the State's decision in each case whether or not to suspend. Furthermore, the Union adds, it did not *give* to the appointing authority the power to suspend: the State gave that power through passage of Civil Service Law § 75, of which Article 8.4A(2) is merely a derivative. These arguments are appealing, and the lack of response from the plaintiff lends them weight. However, the Court need not hunt for arguments to determine whether

or not Article 8 works a disproportionate hardship on blacks, since the plaintiff does not even assert that the State or the Union had discriminatory motives when they agreed upon the summary suspension provision. In *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Supreme Court stated that it had

> not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution.

*Id.* at 242, 96 S.Ct. at 2049. Where, as here, there is neither evidence of disproportionate impact from which discriminatory purpose may in some situations by inferred, *e. g., Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972) (racially non-neutral selection procedures coupled with paucity of blacks on juries shifts the burden of proof to the state to rebut the presumption of unconstitutional action), nor the slightest hint that the Union and the State had race in mind when they agreed on the suspension procedure, an equal protection claim is without substance.

*Breach of Duty of Fair Representation*

█ Smith contends that by negotiating the summary suspension clause in the Collective Bargaining Agreement the Union breached its duty of fair representation to him. The charge is frivolous. The duty of fair representation exists as a result of the recognition that the "grant of power to a union to act as exclusive collective bargaining representative, with its corresponding reduction in the individual rights of the employees so represented" requires a "bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of . . . labor law." *Vaca v. Sipes,* 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967). The duty extends to a union's power to act as an exclusive bargaining agent, *Steele v.*

*Louisville & Nashville Railroad,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), and to its conduct with respect to grievances by individual employees where the union is by contract the exclusive representative for grieving employees. *Vaca v. Sipes, supra.* Insofar as the Court has already determined that the Collective Bargaining Agreement summary suspension provisions do not violate due process, it has ruled a fortiori that there was no breach committed by the Union in negotiating those provisions. The only remaining argument that the plaintiff could make is that the Union somehow breached its duty to him to represent him in a grievance procedure he never pursued or asked to have pursued in his behalf pursuant to the instructions contained in the Notice of Discipline and in the Collective Bargaining Agreement. Although the latter publication does not in so many words state that the Union may be involved in a disciplinary grievance procedure by an employee only at the latter's request, it clearly imparts that information where it states that the employee under Notice of Discipline must be sent two copies of the notification, so that "one may be given to your [union] representative," Collective Bargaining Agreement, Article 8.2A; where it provides that a disciplinary grievance may be served on the employer "by the employee or the Union . . . [either of whom] shall be entitled to a meeting to present his position to the department or agency head," *id.* subsection D; where it states that either the Union or the employee may appeal the disciplinary action to arbitration, *id.* subsection E. Further clauses express the employee's alternatives by providing that the cost of transcripts and the fees and expenses of arbitration will be divided by the employer and the Union or the employer and the employee "if [the employee is] not represented by the Union." *Id.* subsection I. In short, not only was Smith actually aware that he could ask the Union for help, *see* n.1 *supra,* but the material he had from the Union made it abundantly clear that he could have the Union intercede but that the Union would not do so unless requested by the employee.

Finally, the Court cannot even understand, let alone credit, Smith's claim that the Union has contributed to a restriction upon access to an adversarial hearing at arbitration by agreeing to the provision that an employee who elects not to have the Union represent him at arbitration will be required to pay certain costs of arbitration. Plaintiff's Brief at 19. Even less comprehensible is Smith's observation—meant disparagingly—that it is of "great significance . . . that the union consistently maintains that it is not required to handle all grievances or to take them to arbitration." *Id.* Smith seems to be arguing that a deprivation of constitutional magnitude occurs where the cost of grievance is so prohibitive as to prevent an individual from pursuing it alone, but that the Union has somehow breached a duty to him by providing that at his option the Union will pay his way. That position is untenable, as is the general spirit of this Complaint, which seems to demand, first, that the defendant Union be held accountable for not searching out the plaintiff and representing him, willy-nilly, in a grievance mechanism which he gave no indication of wanting and, second, that the Union be penalized for not negotiating with the State a grievance procedure in which the employee's involvement and personal responsibility are entirely unnecessary. Either proposition is devoid of merit.

For all of the foregoing reasons, the Court finds that there is no genuine issue as to any material fact and that the State and Union defendants are entitled to a judgment as a matter of law, and the plaintiff's cross-motion for summary judgment is therefore denied.

So ordered.