**Charles Edward SECRET, Plaintiff-Appellant,**

v.

**David BRIERTON et al., Defendants-Appellees.**

**No. 77–1653.**

United States Court of Appeals, Seventh Circuit.

Argued May 26, 1978.

Decided Oct. 13, 1978.

Rehearing and Rehearing En Banc Denied Dec. 5, 1978.

Jed Robert Mandel, Chicago, Ill., for plaintiff-appellant.

Joseph M. Cotugno, Ill. Dept. of Corrections, Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Judge, PELL, Circuit Judge, and HARPER, Senior District Judge.*

PELL, Circuit Judge.

This is an appeal from a summary judgment for the defendants, prison officials, in a prisoner's suit based on 42 U.S.C. § 1983. The plaintiff, a state prisoner incarcerated in the Stateville Correctional Center, Joliet, Illinois, filed this action alleging that his

---

* Senior District Judge Roy W. Harper of the Eastern and Western Districts of Missouri is sitting by designation.

personal property was unlawfully confiscated from him without due process of law. Specifically, the plaintiff alleged that when he was transferred to Stateville, prison officials confiscated his AM–FM radio/cassette recorder, accompanying adaptor plug and AC power cord, and stereo headphones (hereinafter stero equipment). He also alleged that his stereo equipment was damaged[1] and he asked that it be repaired or replaced and then returned to him.

The stereo equipment apparently was taken from him originally because of a rule against recording devices in the prison. The defendants filed an affidavit of defendant Robert Kapture, Assistant Warden for Operations, which stated that certain modifications were made to the radio/recorder to prevent it from recording and that it was returned to the plaintiff. The district court dismissed the complaint as moot because the plaintiff did not challenge the State's rule against recording devices within the prison and did not dispute that the recorder had been returned to him. The court added that insofar as the plaintiff's complaint sought recovery for the negligent acts of a guard, it failed to state a claim. This statement apparently was in response to the plaintiff's allegation that he had a written statement from a prison guard accepting responsibility for at least some of the damage. The signed statement of the guard, a defendant, states:

1. On May 2, 1977, shortly before the district court dismissed his complaint, the plaintiff sent a letter to the district court judge which described the damage. It stated that the digital tape counter did not function on batteries, that the control buttons for the tape player were severely damaged, that the antenna was broken, that the compartment for the remote microphone was severely damaged, that the volume control fluctuated, that the back cover of the unit was loosened, and that there was possible damage to the transistors manifested by a loss of power. He also stated in an earlier communication (Supplement to his petition filed on March 15, 1977) that his stereo headphones did not function properly resulting in distortion.

2. While we address at some length in this opinion case law relating to the matter of exhausting state remedies prior to the bringing of a

This is to advise that on [April 2, 1976] I accidently knocked over a table which contained resident Secret's radio tape player. The tape player sustained some serious damages, this was the result of a defective chair in which I sat.

If the State will not pay for the repairs I will pay for them personally.

After oral argument before this court, we ordered the parties to submit supplemental briefs on the issue of whether the plaintiff had any obligation to attempt resolution of the dispute by making use of and exhausting an internal grievance procedure at the prison before instituting this action. Because our disposition of the case turns on this issue, we need not address the other issues raised by the plaintiff.

Although the Supreme Court has addressed the requirement of exhaustion of state remedies in § 1983 cases,[2] it has never squarely confronted the issue now before us: whether a state prisoner, alleging deprivation, without due process, of tangible items of personal property of no great monetary value, should be required to utilize readily available prison grievances procedures before making it a federal case by resorting to § 1983 litigation. Nevertheless, the Supreme Court pronouncements in this area have been interpreted by a majority of the courts of appeals as establishing a broad, inflexible rule that exhaustion of state remedies is never required in § 1983

civil rights action, we do have some question as to the real pertinency and applicability of that issue in the factual, or similar, context to that here involved or one similar thereto. What we have in mind in the result we reach is that on the prison scene the development of misunderstandings about property possessory rights is more likely than in other less intimate and less controlled community situations. It seems to us that many of these complaints could, and should, be promptly and effectively resolved by what amounts to nothing more than signing a simple complaint or grievance form with reasonably prompt consideration thereof by prison authorities. Whether or not this simplified handling should properly be termed an administrative procedure, we emphasize that we have not contemplated in the result we reached a highly structured, laborious and possibly frustrating, administrative review procedure.

actions.[3] Because we are of the opinion that the plaintiff in the instant case should have utilized available prison grievance procedures before filing this action, we turn to the relevant Supreme Court cases to determine their applicability to the instant case.

▪ The case often cited as the origin of the no-exhaustion rule is *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). The plaintiffs filed a § 1983 suit alleging that police officers violated their Fourteenth Amendment rights during an unreasonable search of their home. The court of appeals held that the plaintiffs had not stated a cause of action and that they had a remedy in the state courts. The Supreme Court reversed holding that the plaintiffs had stated a cause of action. More importantly for our analysis, however, the Court stated that "the federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." 365 U.S. at 183, 81 S.Ct. at 482. Although this statement clearly suggests that § 1983 plaintiffs need not seek redress in the state courts before filing their federal action, it does not in terms prohibit a federal court from requiring a § 1983 plaintiff to exhaust state *administrative* remedies. The distinction between exhaustion of state judicial remedies and administrative remedies is not a meaningless one. One of the important purposes of § 1983 was to provide a federal forum for an evenhanded enforcement of the law that was not always available in the state courts. That purpose would be frustrated if plaintiffs were forced to sue first in the state court where the resulting judgment would create collateral estoppel effects. This same problem does not arise

with the exhaustion of state administrative remedies. *See Lane v. Wilson*, 307 U.S. 268, 274, 59 S.Ct. 872, 83 L.Ed. 1281 (1939). The principal cost of requiring administrative exhaustion is the delay preceding access to federal court. *See* Comment, *Exhaustion of State Administrative Remedies in Section 1983 Cases*, 41 U.Chi.L.Rev. 537, 551 n. 68 (1974).

The Supreme Court, however, in a subsequent § 1983 case, confronted the issue of exhaustion of administrative remedies. *McNeese v. Board of Education*, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), was a school desegregation case in which the primary administrative remedy available was that the residents of the school district could file a complaint with the Superintendent of Public Instruction alleging racial segregation. He would then set a hearing and, after the hearing, if he decided that the allegations were substantially correct he would *request* the Illinois Attorney General to file suit. The Supreme Court outlined at length the inadequacies of this administrative remedy, noting for example that the Superintendent could provide no independent remedy; he could only "investigate, recommend and report." 373 U.S. at 675, 83 S.Ct. 1433. It then concluded that "[w]hen federal rights are subject to such tenuous protection, prior resort to a state proceeding is not necessary." *Id.* at 676, 83 S.Ct. at 1438.

*McNeese* does not establish a rule that exhaustion of state administrative remedies is never required in § 1983 cases. We agree with the Second Circuit that the case "held only that there was no administrative remedy by which plaintiffs could have any assurance of getting the relief they wanted—an

---

**3.** *See, e. g., United States ex rel. Ricketts v. Lightcap*, 567 F.2d 1226 (3d Cir. 1977); *Gillette v. McNichols*, 517 F.2d 888 (10th Cir. 1975); *McCray v. Burrell*, 516 F.2d 357 (4th Cir. 1975), *cert. dismissed as improvidently granted*, 426 U.S. 471, 96 S.Ct. 2640, 48 L.Ed.2d 788 (1976); *Hardwick v. Ault*, 517 F.2d 295 (5th Cir. 1975); *Hartmann v. Scott*, 488 F.2d 1215, 1223 (8th Cir. 1973); *Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972).

The First and Ninth Circuits have taken less rigid approaches. *See Raper v. Lucey*, 488

F.2d 748 (1st Cir. 1973); *Whitner v. Davis*, 410 F.2d 24 (9th Cir. 1969).

The Second Circuit is the only court to maintain a viable exhaustion requirement in § 1983 cases. *See Plano v. Baker*, 504 F.2d 595 (2d Cir. 1974); *Blanton v. State University of New York*, 489 F.2d 377 (2d Cir. 1973); *Eisen v. Eastman*, 421 F.2d 560 (2d Cir. 1969), *cert. denied*, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 (1970).

end to segregation—even if they were clearly entitled to it." *Eisen v. Eastman,* 421 F.2d 560, 569 (2d Cir. 1969), *cert. denied,* 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 (1970). Thus *McNeese* may be explained as simply following the well-settled doctrine that the courts will not require a futile act, *i. e.,* here that resort need not be had to the administrative remedies which are inadequate, either facially or as applied.

The futility exception to the exhaustion requirement also explains *Damico v. California,* 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967). The plaintiffs in that case filed a § 1983 suit challenging the constitutionality of the state welfare laws. A three-judge district court dismissed for failure to exhaust adequate administrative remedies, and the Supreme Court reversed in a short per curiam opinion. The Court quoted *McNeese* as holding that "relief under the Civil Rights Act may not be defeated because relief was not first sought under state law which provided [an administrative] remedy." 389 U.S. at 417, 88 S.Ct. at 526 (brackets in original). The portion of the *McNeese* opinion that the Court quoted, however, dealt with a state judicial, not administrative remedy. Moreover, we do not read this statement as establishing a broad rule, especially in light of the context. The administrative remedy available in *Damico* would not have been a likely source for relief because the state agency could not declare the challenged law unconstitutional. The futility exception to the exhaustion requirement would appear to have been applicable in this context.

*Houghton v. Shafer,* 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968), follows similar reasoning. In that case, prison authorities had confiscated the petitioner's legal materials because they were found in the possession of another inmate. The petitioner's efforts to obtain the confiscated materials were unsuccessful so he filed a § 1983 suit. The district court dismissed his complaint on the sole ground that he had not alleged exhaustion of state administrative remedies. The Supreme Court noted that he did seek relief from the Deputy Superintendent of his prison, but did not

appeal to the Deputy Commissioner of Correction, to the Commissioner, or to the Attorney General. Because the Attorney General had submitted to the Court that the prison rules were validly and correctly applied to the petitioner, the Court recognized that requiring an administrative appeal to that same officer "would be to demand a futile act." *Id.* at 640, 88 S.Ct. at 2120. The Court added that "[i]n any event, resort to these remedies is unnecessary in light of our decisions in *Monroe v. Pape,* . . . *McNeese v. Board of Education,* . . . and *Damico v. California* . . . ." *Id.* (page citations omitted). We read these cases, consistently with *Houghton,* as holding that the requirement of exhaustion of administrative remedies has no applicability where those remedies would be inadequate or where their exhaustion would certainly or probably be futile. *See Eisen v. Eastman,* 421 F.2d at 569.

*Wilwording v. Swenson,* 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971), does not establish a broader rule. In that case, the court of appeals had affirmed the district court's dismissal of prisoners' habeas corpus petitions complaining of their conditions of confinement. The Supreme Court reversed in a per curiam opinion which held that the prisoners were entitled to have their actions treated as § 1983 claims. Although the Court, quoting *Monroe v. Pape,* stated that exhaustion of state remedies was unnecessary, and quoting *Houghton,* stated that state prisoners "are not held to any stricter standard of exhaustion than other civil rights plaintiffs," the question before the Court was whether exhaustion of state *judicial* remedies should be required. That this was the issue is clear from the court of appeals decision which had suggested preliminary resort to the state courts to assert various claims. *Wilwording v. Swenson,* 439 F.2d 1331, 1336 (8th Cir. 1971). *See Blanton v. State University of New York,* 489 F.2d 377, 384 (2d Cir. 1973). Thus any intimation of an inflexible rule against exhaustion of state administrative remedies was dicta.

That the Court has retained a more flexible approach in this area is supported by *Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973). The plaintiffs, licensed optometrists, filed a § 1983 suit to enjoin proceedings against them pending before the Alabama Board of Optometry. They alleged that the Board was biased and could not provide them with a fair and impartial hearing. The Supreme Court agreed with the lower court that the plaintiffs were not required to exhaust administrative remedies, but the Court expressly left open the question of whether the non-exhaustion rule in § 1983 cases was "invariably the case." *Id.* at 574–75, 93 S.Ct. 1689. *See id.* at 581, 93 S.Ct. at 1699 (Marshall and Brennan concurring: "I join the opinion of the Court except insofar as it suggests that the question remains open whether plaintiffs in some suits brought under 42 U.S.C. § 1983 may have to exhaust administrative remedies."). The majority held that exhaustion was not required in the case because the "complaint was that the State Board of Optometry was unconstitutionally constituted and so did not provide them with an adequate administrative remedy requiring exhaustion," and "[t]hus, the question of the adequacy of the administrative remedy, an issue which under federal law the District Court was required to decide, was for all practical purposes identical with the merits of appellees' lawsuit."

We do not intend to suggest from our discussion of these Supreme Court opinions that they provide any direct support for our conclusion to require utilization of internal prison procedures in the case before us. Rather, we suggest only that these opinions do not preclude our decision in the present case. Having extrapolated from these cases a non-rigid approach to the exhaustion requirement, the circumstances of the instant case present, in our opinion, an appropriate setting for requiring the plaintiff to utilize the available internal prison remedies before filing a § 1983 claim.

■ Several factors contribute to our decision in the present case, not the least of which is the worthwhile objective of filtering out the frivolous or readily resolvable disputes that develop in this nation's prisons, and thereby to provide some additional time frame for the consideration in the crowded docket complex of today's courts of cases exhibiting potential merit. Since *Monroe v. Pape,* the number of prisoner civil rights petitions has increased the caseload drastically and, indeed, traumatically. *See Comment, State Prisoners and the Exhaustion of Administrative Remedies: Section 1983 Jurisdiction and the Availability of Adequate State Remedies,* 7 Seton Hall L.Rev. 366, 390 (1976). We agree with the comments of Chief Judge Northrop in *McCray v. Burrell,* 367 F.Supp. 1191, 1206 (D.Md.1973), *rev'd,* 516 F.2d 357 (4th Cir. 1975), *cert. dismissed as improvidently granted,* 426 U.S. 471, 96 S.Ct. 2640, 48 L.Ed.2d 788 (1976):

> The number of these petitions found to have merit is very small, both proportionately and absolutely. But it is of the greatest importance to society as well as to the individual that each meritorious petition be identified and dealt with. And yet it seems a misallocation of resources to impose the burden of sifting through the mass of these petitions on federal judges . . . . Moreover . . . these overburdened judges . . . are less likely to give full and careful attention to each petition than officials whose special task it might be made to do so.

By requiring the plaintiff in the instant case to utilize the available prison grievance procedures, the likelihood of a relatively speedy resolution of his dispute and the con-comitant avoidance of federal court litigation would be heightened. Most importantly, such a procedure would not deprive a prisoner of an opportunity to air his complaint before a federal court if he were dissatisfied with the results of the internal prison procedures. But we are confident that prior utilization of those procedures will provide an adequate remedy in many cases, weed out spurious claims in some cases, and offer the prisoner an acceptable settlement in others. For example, in the present case, the prison guard's offer to pay for the damages to the plaintiff's stereo

equipment may well have resulted in a fair settlement had the prison grievance procedures been utilized. In fact, if the guard's affidavit is correct in that he *negligently* caused serious damage to the equipment, the plaintiff would in all likelihood recover more by utilizing the prison procedures than by filing in federal court because negligent damage to property would not state a claim under § 1983. *See Bonner v. Coughlin,* 545 F.2d 565 (7th Cir. 1976).

The major cost of requiring a prisoner to exhaust internal prison remedies before filing his suit in federal court is the delay that precedes his opportunity to litigate his claim. That delay, albeit not an insignificant drawback, may not be as burdensome as it might first appear. Those prisoners who file § 1983 claims after exhausting internal prison procedures are more likely to encounter somewhat more expeditious handling of their complaints. We would anticipate such a result because one of the more time-consuming aspects of federal court disposition of these cases is that of clearly defining the relevant allegations. Because the vast majority of these cases are filed without the benefit of formal legal assistance, judges and law clerks expend substantial time and energy analyzing these pro se complaints, which are held to less stringent standards than formal pleadings drafted by lawyers, to determine whether "it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972).

We must add at this point that we in no way suggest if the saving of judicial time and energy per se were a motivating factor in the result that we reach that we would be justified in doing so. We have no fear that that time and energy will not be fully occupied by the ever increasing caseload in all courts. Rather we are concerned with the best utilization of that judicial time and energy particularly when it is not to the detriment of claims for relief as we believe would be in the situation in the type of case we have here. Putting the § 1983 tag on a lawsuit without more should not provide automatic and unquestionable entry into the federal court forum. Utilization of available expeditious prison grievance procedures in the case of justifiable claims of the type here involved should, although perhaps denying a trip to the courts, resolve the underlying complaint satisfactorily, which, after all, is the ultimate purpose of all litigation.

If the prisoner has utilized internal prison procedures before filing in federal court, his complaint and any accompanying documents generally will be more refined and the pertinent issues will be more sharply drawn into focus. Moreover, the internal prison procedures will often provide a written record of some sort to aid the court in understanding the facts. The time saved as a result of these procedures should mitigate, to some degree, the delay inherent in the exhaustion requirement by shortening the time necessary for the district court to render its decision.

■ We do not suggest that the judicial time saved by more refined complaints will totally offset the delayed access to federal court that will necessarily result from requiring a prisoner to utilize internal prison procedures. Indeed, we recognize that such a requirement in some cases may well result in less speedy redress of civil rights violations. It is for this reason that we narrowly confine our holding in this case. We confine the applicability of our holding to prisoner § 1983 cases which allege deprivation without due process of law of tangible items of personal property of no great monetary value. The delayed access to federal court resulting from exhaustion is less likely to impose severe burdens on the constitutional rights of prisoners than in other civil rights cases such as those raising liberty interest issues, or property deprivation claims, such as deprivation of legal materials, which might directly reflect upon liberty issues. This is particularly true in the context of a prison. Although an individual does not lose all of his constitutional rights upon being imprisoned, his rights are clearly circumscribed. *See generally* J. Nowak,

R. Rotunda & J. Young, Constitutional Law, 505 (1978). As the Supreme Court recently stated in *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 125, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629 (1977), "this Court has long recognized that 'lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" For example, one's right to possess personal property is severely diminished upon imprisonment. There is no constitutional right prohibiting prison officials from confiscating most of a prisoner's personal property pending release from prison. The constitutional violation arises only if they confiscate that property without due process of law. Therefore, any delay attending the return and/or repair of property confiscated without due process of law is necessarily less onerous than a delay in redressing the violation of other rights because of the diminished nature of a prisoner's property rights. *A fortiori* the delay is generally less onerous if the property is not of great monetary value.

Our decision to require the plaintiff to utilize the available internal prison procedures before filing his § 1983 claim is also consistent with and indeed promotes the policy of affording deference to state officials' administration of their prisons. In *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974), the Supreme Court recognized that

> courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.

*Accord, Jones v. North Carolina Prisoners' Union,* 433 U.S. at 126, 97 S.Ct. 2532; *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). At least one court has acknowledged that an inflexible rule against requiring exhaustion of internal prison procedure directly conflicts with the usual deference given to prison administrative procedures. Judge Van Dusen's concurring opinion in *United States ex rel. Ricketts v. Lightcap,* 567 F.2d 1226 (3d Cir. 1977), states that

> [t]he majority admits that the rule not requiring exhaustion followed in this case is not fully consistent with the usual deference given to prison administrative procedures. I think that this is manifestly true and that the peculiar problems of prison administration and discipline require courts to show a degree of deference to prison procedures, even when the method of adjudicating constitutional rights is at stake.

*Id.* at 1234. We agree, and add only that in cases such as the one before us, in which exhaustion imposes only a moderate delay, and in which deference to prison administrative procedures may be easily accommodated without undue burdens on the prisoner's claimed constitutional failure to require exhaustion would place a substantial strain on federal-state relations.

■ In connection with the matter of comity, we must also observe that any inflexible adherence to a non-requirement of exhaustion of state remedies prior to the filing and pursuing of a civil rights § 1983 action is based on no sacrosanct constitutional foundation. State prisoners are entitled to federal habeas corpus upon proof "that their detention violates the fundamental liberties of the person, safe-guarded against state action by the Federal Constitution." *Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963). Federal habeas petitions by state prisoners frequently, if not ordinarily, seek relief from a curtailment of liberty of a more substantial nature than those involved in a great many prisoner § 1983 cases; yet, the requirement of exhaustion of state remedies is a necessary prelude to pursuit of the Great Writ. The doctrine of the necessity of exhaustion here was developed by the Supreme Court, and in 1948 "[t]his rule of comity was written into the statutes [28 U.S.C. § 2259(b), (c)]." C. Wright, Handbook of the Law of Federal Courts, 240 (3d

Ed.1976). It is clear then that doing away with a requirement of exhaustion is not constitutionally mandated. The present matter being one of judicial construction of legislative intent, we are not persuaded that the result we here reach does violence to that intent.

■ Our decision to require the plaintiff to utilize the available prison grievance procedures before filing his § 1983 claim presupposes that the available procedures are adequate. Because the grievance procedures themselves could not deprive the plaintiff of a constitutionally protected interest, and because the plaintiff has the unfettered right to file his claim in federal court after exhausting those procedures, a strict due process analysis does not apply to the adequacy of those procedures. Although we have found no case law guidance in this area, we are of the opinion that the prison procedures will be considered adequate if they satisfy the following broad requirements. They must be capable of providing the remedy sought by the plaintiff. They must be capable of providing that remedy within a reasonable time so as not to delay unduly the plaintiff's right to file his complaint in federal court. Finally, they must not be so inherently unfair that utilization of them would be futile.[4]

■ Having analyzed the Illinois prison grievance procedures available to the plaintiff, *see* Appendix, in light of the standards noted above, we find them to be adequate, and thus hold that the plaintiff must utilize those procedures before filing a § 1983 claim in federal court. For these reasons, we affirm the district court's dismissal of the plaintiff's complaint, but direct the district court to modify the judgment to specify that the dismissal is without prejudice. This will allow the plaintiff to file his complaint again if he does not find adequate relief by utilizing the prison grievance procedures.

AFFIRMED.

4. We note that our opinion today should provide an incentive for state prison administrations to adopt and comply with adequate internal prison dispute resolution procedures so as to avoid a potentially substantial amount of federal court litigation.

APPENDIX

Illinois Department of Corrections Adult Division Administrative Regulation No. 845:

Grievance Procedures for Residents (Effective 11/30/76).

I. POLICY OF DEPARTMENT: To provide an opportunity for residents to air and seek resolution to complaints, problems and grievances which they have not been able to resolve through other avenues at the institution or facility. Such a grievance procedure ensures the involvement of active local and departmental administration with individual residents' problems, and that all residents are treated in an equitable manner.

II. EXPLANATION:

A. As a matter of policy, the Chief Administrative Officer of each Adult Division institution or facility shall install locked mailboxes in all cellhouses, dormitories and residential units into which residents may place written complaints and grievances designated for the Chief Administrative Officer or the Chairman of the Institutional Inquiry Board. All communications placed in these boxes by residents are to be collected daily and routed directly to the addresses.

B. Each Chief Administrative Officer shall appoint three employees to serve on the Institutional Inquiry Board to attempt to resolve problems, complaints and grievances that residents have been unable to resolve through normal channels. One of these employees shall be designated as Chairman of the Inquiry Board. The Chief Administrative Officer shall also appoint several alternate members who may serve in the absence of a regularly-appointed Board

member. At least one member of every such Inquiry Board shall be a superior officer of lieutenant rank or above, and at least one member shall be a Program Services staff member.

C. No person directly responsible for the condition or action being grieved or who has been a member of the Adjustment Committee which heard a Resident Information Report based on the same set of facts out of which the incident being grieved arose may sit on the Inquiry Board that hears that particular case.

D. The Institutional Inquiry Board shall meet at least weekly, providing one or more problems, complaints, or grievances have been filed with the Chairman of the Board.

E. A resident must have an opportunity to appear before the Institutional Inquiry Board and the Board shall have the right to summon any other witnesses—residents or staff—it deems appropriate.

F. The Institutional Inquiry Board shall file a written report regarding its findings and recommendations with the Chief Administrative Officer within 10 working days after the complaint is received by the Chairman of the Inquiry Board.

G. The Chief Administrative Officer or his designee shall, after evaluating the Inquiry Board's report, advise the resident in writing as to what action, if any, he has taken or intends to take within five calendar days after receiving the Board's report. Copies of the resident's letter to the Board, copies of the Board's report to the Chief Administrative Officer, and copies of the Chief Administrative Officer's response to the resident shall be maintained for at least one year and shall be available to the Administrator of Institution Services and/or the Director of Corrections upon request.

H. If, after receiving the official response from the Chief Administrative Officer, the resident still feels that the problem, complaint or grievance has not been resolved to his satisfaction, he may appeal in writing to the Director of Corrections.

I. The Director of Corrections and/or his designee will review all such complaints, problems or grievances submitted. If, after reviewing all the reports from the Institutional Inquiry Board and the local administration, the Director feels that the case is without merit, he will so advise the resident in writing.

J. If the Director is of the opinion that the case has merit or that further investigation of the complaint, problem or grievance is in order, he will refer the matter to the Administrative Review Board.

K. A three-member Administrative Review Board shall be appointed by the Director, and at least one member of the Board shall be an individual not employed by the agency.

L. The Administrative Review Board will meet as frequently as necessary and may schedule hearings at Adult Division institutions. When such hearings are scheduled, the Board shall have the authority to call witnesses before it—residents and staff.

M. The Administrative Review Board shall file with the Director of Corrections a written report which shall contain the Board's findings and recommendations.

N. The Director will make a final determination and so advise the resident in writing.

O. Residents of Adult Division institutions and facilities must be informed of these procedures in writing by the Chief Administrative Officer.

P. Under no circumstances may any disciplinary action be taken against a resident for using the procedures established herein.