Christian SAHAGIAN, Petitioner,

v.

Walter DICKEY, Warren Young, James Murphy, Lutz Riegert, James Richardson, and Wisconsin Division of Corrections, Respondents.

No. 86–C–793–C.

United States District Court,
W.D. Wisconsin.

Nov. 5, 1986.

Christian Sahagian, pro se.

ORDER

CRABB, Chief Judge.

Petitioner, who is presently incarcerated at the Columbia Correctional Institution at Portage, Wisconsin, requests leave to proceed in this civil action without prepayment of fees and costs or security therefor, pursuant to 28 U.S.C. § 1915. Petitioner seeks to challenge the practice by which 15% of all money sent to him in prison is retained by prison authorities and put into a separate release account to which he will not have access until he is released from prison. Jurisdiction is alleged under 28 U.S.C. § 1343 and 42 U.S.C. § 1983. From the affidavit of indigency attached to petitioner's proposed complaint, I conclude that he is unable to prepay the costs of commencing this action.

*Allegations of Fact*

Petitioner alleges that he has been incarcerated at the Columbia Correctional Institution since July 24, 1986. Prior to that, petitioner was incarcerated at the Waupun Correctional Institution at Waupun, Wisconsin. Respondent Walter Dickey is the administrator of the Wisconsin Division of Corrections and is responsible for the operation and management of the Division of Corrections and all prisoners and personnel employed therein. Respondent Warren Young is the superintendent of the Waupun Correctional Institution and is responsible for the operation and management of that institution. Respondent James Murphy is the superintendent of the Columbia Correctional Institution and is responsible for the operation and management of that institution. Respondent Lutz Riegert is the business manager at Waupun Correctional Institution and has fiduciary responsibility for the property and funds of prisoners incarcerated at Waupun. Respondent James Richardson is the business manager at Columbia Correctional Institution and has fiduciary responsibility for the

property and funds of prisoners incarcerated at Columbia.

Petitioner was first received at Waupun Correctional Institution in August of 1982. Upon entering the custody of the Wisconsin Division of Corrections, petitioner signed an express contractual agreement giving the Division the authority to open mail addressed to petitioner and to act as petitioner's financial agent with regard to the endorsement and cashing of commercial paper and negotiable instruments made payable to petitioner. This agreement is the only authority that the Division has for endorsing and cashing such instruments.

Petitioner was transferred to the custody of the federal Bureau of Prisons in 1983. He was returned to Waupun in October of 1985. On his return to Waupun, petitioner was informed that prisoners were no longer permitted to disburse amounts in excess of $25 to family members and friends from inmate accounts unless they had special permission from the superintendent of Waupun. This rule applies regardless of the origin of the funds in the inmate's account.

On May 29, 1986, petitioner was issued a statement of the money in his inmate account, showing that prison authorities had received a check for $25 made payable to petitioner. The check was endorsed and cashed under the authority of respondent Riegert. $3.75 of this money was not placed in petitioner's regular account; instead, it was placed in a segregated account labelled "release account." The placement of the $3.75 in the release account was done without petitioner's consent.

On May 30, 1986, a memorandum was issued to the Waupun prison population, informing the inmates that 15% of all money an inmate received from family and friends would be diverted from the inmate's regular account and placed in a segregated release account. Money would be diverted in this way without the inmate's consent, and would continue to be diverted until the amount in the release account reached $500. Prisoners would not be able to remove money from their release accounts, and no mention was made of paying prisoners interest on the money in the release accounts.

Also on May 30, petitioner submitted an inmate complaint to respondent Young, informing him that petitioner objected to the diversion of 15% of his money to the release account and that he had not consented to the creation of a release fund for him or to the diversion of any money, and requesting that no money be taken out of his account without his consent. Petitioner also informed respondent Young that if money was diverted from his account without his consent, petitioner would no longer permit the Division of Corrections to endorse and cash checks for him.

On June 3, 1986, petitioner informed respondent Riegert of the objections to the release account that he had already made to respondent Young. Petitioner also informed respondent Riegert that in the future all incoming checks payable to petitioner should be forwarded uncashed to petitioner's wife. Petitioner received a response from respondent Riegert on June 6 stating that the policy of diverting 15% of incoming money to release accounts could be changed only by the Division of Corrections.

On June 10, 1986, petitioner notified respondents Young and Riegert that he was rescinding the power that he had granted to the Division of Corrections to endorse and cash checks payable to petitioner. Petitioner also informed respondents Young and Riegert that in his opinion, if the Division continued to endorse his checks, the respondents could be criminally prosecuted. Petitioner's notice of rescission was made pursuant to Wis.Stat. § 702.09(2), and was received by respondents Young and Riegert on June 17, 1986.

On June 16, 1986, a negotiable draft for $10 payable to petitioner was endorsed and cashed under the guidance of respondent Riegert. $1.50 of this draft was diverted from petitioner's regular account.

On July 10, 1986, two negotiable drafts for $11 payable to petitioner were endorsed and cashed under the guidance of respondent Riegert. $1.65 was diverted from petitioner's regular account.

Petitioner was transferred from Waupun to Columbia on July 24, 1986. On August 12, 1986, petitioner received an answer to the inmate complaint he had filed with respondent Young, and learned that his complaint had been dismissed. Plaintiff appealed the dismissal of the complaint to respondent Dickey. The appeal was received by respondent Dickey on August 19, 1986.

On September 4, 1986, commercial paper for $46.35 payable to petitioner was endorsed under the authority of respondent Richardson. On the same day, petitioner gave notice to respondent Richardson that he was rescinding the authorization that he had given to the Division of Corrections to permit the Division to endorse and cash commercial paper and negotiable drafts payable to him. Petitioner also informed respondent Richardson that the check for $46.35 should not be cashed, and that any further checks payable to petitioner received by the Division should be forwarded to petitioner's wife. Petitioner was informed by respondent Richardson on September 5, 1986 that respondent Richardson would continue to deposit all funds received for petitioner.

Petitioner submitted an inmate complaint to respondent Murphy concerning the endorsement and cashing of checks without his permission and the transfer of 15% of the money. Respondent Murphy received this complaint on September 6, 1986. On September 18, 1986, a negotiable draft in the form of a postal money order payable to petitioner was endorsed and cashed without petitioner's permission. Respondent Murphy dismissed petitioner's complaint on September 19, 1986 and refused to take corrective action. Respondent Dickey dismissed plaintiff's appeal.

Because of the policy of transferring 15% of all incoming funds to a release account, petitioner's family and friends no longer send petitioner money. Petitioner receives no money at present from any source. Columbia Correctional Institution rules require that petitioner purchase personal hygiene items, food, vitamins, writing supplies and stamps from the prison canteen. Petitioner is not permitted to receive such items through the mail. Petitioner can gain access to the canteen only with funds sent to him by his family and friends.

Under the prison rules regarding release account funds and in contrast to the treatment of money received from inmates' friends and family, 15% of prisoners' wages are not removed and transferred to release accounts. The burden of the transfer of funds is felt by prisoners without a monthly prison wage, whose only source of money is gifts mailed in by family.

### Petitioner's Contentions

Petitioner contends that respondents' acts constitute violations of various criminal statutes as well as his federal constitutional rights. The criminal statutes that petitioner claims have been violated are Wis.Stat. §§ 943.20 (theft) and 943.38 (forgery), and 18 U.S.C. §§ 500 (forging signatures on postal money orders), 1342 (use of fictitious name to receive mail), and 1691 (conversion and improper handling of postal money orders). In addition to these alleged criminal violations, petitioner contends that his Fifth and Fourteenth Amendment rights of due process have been violated in that he has been deprived of property without due process of law. Specifically, petitioner argues that he was deprived of property without due process when respondents Riegert and Richardson continued to endorse and cash his checks in spite of the fact that petitioner had withdrawn his consent to their doing so. In addition, petitioner contends that he was deprived of due process when respondent Wisconsin Division of Corrections adopted policies permitting 15% of all money sent to petitioner to be transferred to a segregated release account, and when the Division adopted policies limiting the amount that petitioner can send from his inmate account

to persons outside the prison. Finally, petitioner argues that his Fourteenth Amendment right to the equal protection of the laws has been violated, in that there is discrimination between prisoners whose only source of money is from outside (15% deduction taken) and prisoners who earn prison wages (no deduction) with regard to the purchase of canteen items. Petitioner seeks declaratory and injunctive relief, compensatory and punitive damages, and issuance of criminal complaints against the respondents. Petitioner seeks to sue all respondents in both their official and their individual capacities.

### Opinion

■ A prisoner's *pro se* complaint must be construed liberally, *Haines v. Kerner,* 404 U.S. 519, 521, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972), and leave to proceed *in forma pauperis* will be denied only if a proposed complaint clearly fails to state a claim upon which relief can be granted under federal law. *Wartman v. Branch 7, Civil Division, County Court, Milwaukee County, State of Wisconsin,* 510 F.2d 130 (7th Cir.1975).

■ None of the criminal statutes that petitioner contends have been violated provide for a private cause of action by the injured party. Authority to initiate a criminal complaint rests exclusively with state and federal prosecutors; whether to bring such a complaint is generally within the discretion of the prosecutor. This court does not have jurisdiction to order that a criminal complaint be filed. Accordingly, plaintiff will be denied leave to proceed on all of his claims relating to the alleged violation of state and federal criminal laws.

### I. Due Process Claims

#### A. Existence of a Property Interest

Petitioner's constitutional due process claims concerning the money placed in the segregated release account and the limitation on the amount of money he can send out of prison require a more extended discussion. The United States Supreme Court has held that where a party alleges that he or she has been deprived of property pursuant to established state procedure, as opposed to random and unauthorized state action, the party may bring a due process claim under 42 U.S.C. § 1983. *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984), expressly reaffirming *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). The actions complained of here are clearly authorized by the following sections of the Wisconsin Administrative Code and the Wisconsin Statutes.

Section HSS 309.45 of the Code provides in part as follows:

> The division shall manage inmate funds and permit and forbid spending to achieve the following objectives:
>
> (1) To promote the eventual successful reintegration of inmates through a policy designed to ensure an inmate will have $500 or more in an institution controlled account upon release and can manage it responsibly; ...
>
> (5) To give inmates the opportunity to manage their funds in a manner consistent with ss. HSS 309.45–309.52.

Section HSS 309.46 provides as follows:

> All money in any form delivered to any institution for the benefit of an inmate shall be delivered to the institution business manager. The institution business manager shall credit the appropriate account in the name of the inmate in accordance with these sections and ch. HSS 324 [relating to work and study release].

Section HSS 309.49 provides in part as follows:

> (1) General account funds ... shall be disbursed by the institution business manager under sub. (3). All disbursements shall be consistent with the purposes under s. HSS 309.45....
>
> (3) Requests for disbursement in excess of $25 to more than one close family member and to other persons under sub. (4)(a) may be made only with written permission of the superintendent or designee....

Clearly, Section HSS 309.45 authorizes the Division to forbid inmates to spend portions of their funds in order to create a $500 release account for each inmate. Section HSS 309.46 provides that when money in any form is delivered to an institution for the benefit of an inmate, the business manager "shall credit" the inmate's account with the money in accordance with other code provisions. I cannot find any code provision requiring that an inmate must consent to the business manager's handling of money delivered to the institution for the inmate. Section HSS 309.49 provides that disbursements from inmate accounts must be consistent with the purposes of § 309.45, which includes the purpose of providing $500 release accounts for inmates, and also provides that disbursements to persons outside the institution (except for one close family member) may be limited. Statutory authority for these code sections may be found in Wis.Stat. § 46.07(1), which provides in part as follows:

> All money including wages ... and other property delivered to an officer or employe of any institution for the benefit of an inmate shall forthwith be delivered to the steward, who shall enter the same upon the steward's books to the credit of the inmate. The property shall be used only under the direction and with the approval of the superintendant or warden and for the crime victim and witness assistance surcharge under s. 973.045(4) *or the benefit of the inmate ...*

(Emphasis added). Section 46.07(1) authorizes the use of property received for an inmate for the inmate's benefit. It provides statutory authority for the release account provision of section HSS 309.45, Wis.Adm.Code, the purpose of which is to promote the successful reintegration of inmates after their release.

Since there is no question that the alleged deprivation of property in this case was the result of an established state procedure, the specific holding in *Hudson v. Palmer*, that a § 1983 action for an unauthorized intentional deprivation of property would be barred by the existence of a meaningful post-deprivation remedy, is not applicable. Accordingly, I must determine whether petitioner's allegations state a claim for deprivation of constitutional due process.

An initial question regarding petitioner's due process claims is whether petitioner can be considered to have been deprived of any protected interest. Petitioner has not been permanently deprived of the money that is placed into the release account. He is denied the use of the money in the account at present, but it will be returned to him upon his release from prison. At most, petitioner is denied the use of the money in the release account during the period that he is incarcerated and cannot make use of the money.[1] Presumably, the restriction on how much money may be sent out of prison prevents petitioner from disposing of his money as he wishes.

The Supreme Court has held that "a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment." *Fuentes v. Shevin*, 407 U.S. 67, 84–85, 92 S.Ct. 1983, 1996, 32 L.Ed.2d 556 (1972), citing *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349. I am not entirely convinced that this principle extends to the deprivation alleged here. *Fuentes* was a challenge to prejudgment replevin statutes that permitted a private party to obtain a prejudgment writ of replevin through a summary proceeding. The person whose property was seized as a result of the writ could regain the property only by posting a security bond for double the value of the property. Thus, under the replevin statutes, for some period the person whose property was seized would be

---

1. Petitioner alleges that the memorandum that informed inmates at Waupun that money would be diverted from their regular accounts to segregated release accounts "makes no mention of interest being paid to the prisoner on his mon-ey." However, since petitioner does not allege that prisoners are paid interest on their regular accounts, it is difficult to imagine how the failure to pay interest on release accounts would be a source of constitutional injury.

deprived of actual ownership either of the property or of the bond posted. In contrast, the money in an inmate's release account remains his own even though he does not have access to it. However, given the Court's broad statement in *Fuentes,* and because prisoners are deprived of the use of release account funds while incarcerated, I will assume for purposes of deciding whether to grant leave to proceed that petitioner has been deprived of a property interest in the use of money in his release account during incarceration.

■ However, I cannot conclude that petitioner has been deprived of any property interest by the restriction on the amount of money he can send out of prison. Petitioner has not alleged that he has tried to send money out of the prison and been prevented by the rule. Petitioner has alleged that his only source of money is gifts from family and friends, and that his family and friends have stopped sending him money since prison authorities began deducting 15% from every check that comes in. Therefore, it appears that petitioner would be unable to send money out of the prison even if he wished to do so. Moreover, even if petitioner has been prevented from sending money outside the prison by the restriction, the Court of Appeals for the Seventh Circuit has applied a rational basis test to a due process challenge to a prison regulation prohibiting inmate transfers of property, and has upheld such a rule based on a governmental objective of institutional security. *Ford v. Schmidt,* 577 F.2d 408, 410 (7th Cir.1978), *cert. denied,* 439 U.S. 870, 99 S.Ct. 199, 58 L.Ed.2d 181. Petitioner will be denied leave to proceed *in forma pauperis* on his due process claim related to the limitation on the amount of money that can be sent out of prison.

Petitioner is challenging both the deprivation of his property interest in the use of money in his release account while he is incarcerated, and the code procedures by which the release account program is administered. Therefore, the allegations of the complaint may be construed as claims for violations of both substantive and procedural due process. Substantive due process protects against governmental deprivations of certain kinds of rights. In contrast, procedural due process

> ... places restrictions on the manner in which the government may undertake actions that infringe upon the rights of the citizenry; it imposes no limitations on the ends that such governmental action, accompanied by proper procedures, may achieve. The right to procedural due process 'raises no impenetrable barrier to the taking of a person's possessions or liberty, or life. Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty or property.'

*Owen v. Lash,* 682 F.2d 648 (7th Cir.1982), citing *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1977) and *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556.

### B. *Substantive Due Process*

■ I am not convinced that petitioner's allegations concerning the release account state a claim for violation of a substantive due process right. The Court of Appeals for the Seventh Circuit has stated that "[t]here is no constitutional right that prohibits prison officials from confiscating most of a prisoner's personal property pending release from prison. The constitutional violation arises only if they confiscate that property without due process of law." *Secret v. Brierton,* 584 F.2d 823, 830 (7th Cir.1978). This suggests that a claim of procedural due process is the only due process claim an inmate has when he is deprived of property interests during the period of his incarceration. Petitioner will be denied leave to proceed on a substantive due process claim for the deprivation of his property interest in the money placed in his release account.

### C. *Procedural Due Process*

■ As explained above, a procedural due process claim goes not to the deprivation of an interest, but rather to the man-

ner in which a person is deprived of that interest. For purposes of deciding whether to grant leave, I have assumed that petitioner has been deprived of a property interest in the use of the money that is kept in his release account while he is incarcerated. The question is what process was due petitioner before he was deprived of that interest.

The United States Supreme Court has held that in determining what process is due before a person is deprived of an interest, three factors must be considered: the importance of the private interest and the length or finality of the deprivation, the likelihood of governmental error and the probable value of additional procedural safeguards, and the magnitude of the governmental interests involved. *Logan v. Zimmerman Brush Co.*, 455 U.S. at 434, 102 S.Ct. at 1157; *Mathews v. Eldridge*, 424 U.S. 319 at 334–335, 96 S.Ct. 893 at 902–03, 47 L.Ed.2d 18; *Miller v. City of Chicago*, 774 F.2d 188, 191 (7th Cir.1985). The general rule is that "absent an extraordinary situation the power or the state to seize a person's property may not be invoked without prior notice and an opportunity to be heard." *Miller v. City of Chicago*, 774 F.2d at 191. I will consider these factors in turn.

The private interest involved is petitioner's interest in being able to control the money that is sent to him. Petitioner has not alleged how much money is in his release account at present, so I cannot determine the amount of money of which he is deprived of control. The applicable Administrative Code provision provides authority for the establishment of release accounts containing "$500 or more." It seems unlikely that petitioner's account contains anywhere near $500, because it appears that the account was not created until May 1986 and only small sums have been placed in the account since then. Petitioner has not been permanently deprived of this money, since it will be returned to him when he is released from prison. Petitioner has not alleged when his release will be, so I cannot determine how long the deprivation will last. I conclude that the degree of impor-

tance attached to this property interest is attenuated by the fact the money kept in a release account still belongs to petitioner, and by the fact that the money will be returned to petitioner when he is released.

The risk of governmental error in deducting 15% from incoming checks and placing the money in a separate release account seems slight. Of course, it is possible that through clerical error a mistake in calculating 15% of a check might be made, or that once calculated the amount to be deducted might be added to the release account of another inmate. However, such errors would probably be speedily detected, since section HSS 309.47, Wis.Adm.Code, requires prison authorities to provide inmates with a monthly statement of transactions involving personal funds and the statements submitted by petitioner in support of his complaint establish that these statements reflect each check that comes in and each release account deduction made. The value of additional procedures to prevent such errors would be minimal.

Section HSS 309.45(1), Wis.Adm.Code, which authorizes the creation of release accounts, states that the purpose of such accounts is "to promote the eventual successful reintegration of inmates" upon their release. Such an interest must be given substantial weight. In considering the governmental interest involved, it is also necessary to look at "the fiscal and administrative burdens that the additional or substitute proceedings would involve." *Miller v. City of Chicago*, 774 F.2d at 191. The complaint does not contain any allegations concerning the number of checks that the Waupun and Columbia prisons must process each month, but it seems likely that requiring additional procedures before each such check could be processed would amount to a substantial burden on the prison administration.

Based on this consideration of the *Mathews* factors, it is not clear that additional procedural safeguards are required before release account funds are deducted from money sent to prisoners. This conclusion

is strengthened by the fact that the code provisions that authorize the establishment of release accounts are general enactments that apply equally to all prisoners in the Wisconsin prison system. It is well settled that no hearing is required where a legislative rule of conduct that applies to more than a few people is used to affect the property of an individual. *Bi-Metallic Co. v. Colorado*, 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915); *E & E Hauling, Inc. v. Forest Preserve Dist., Etc.*, 613 F.2d 675, 682 (7th Cir.1980); *United States Labor Party v. Oremus*, 619 F.2d 683, 690 (7th Cir.1980). I conclude that no additional procedures are required before money is taken from checks sent to petitioner and placed in petitioner's release account. Petitioner will be denied leave to proceed on his procedural due process claim.

## II. Equal Protection

Petitioner raises a second challenge to the release account program based on the equal protection clause. Petitioner has alleged that he is a member of a group of prisoners who do not receive prison wages and whose only source of income is money sent by family and friends. Petitioner contends that this group is discriminated against in the purchase of items from the prison canteen in relation to prisoners who earn prison wages, because 15% of all money sent into the prison is deducted for release accounts, while 15% is not deducted from prison wages.

The provisions of the Wisconsin Administrative Code that deal with inmate funds do not seem to contemplate that funds inmate receive from outside the prison shall be treated differently from funds received as inmate wages. Section HSS 309.45(1), which provides generally for inmate funds and authorizes the creation of release accounts, does not require that the funds from which release accounts are to be created come from any specified source. Section HSS 313.08, which provides for compensation for inmates working in prison industry shops, contains no special provisions concerning what is to be done with

such wages, so presumably section HSS 309.45 applies to these funds. Section HSS 324.09(6) provides that "[a]ll paychecks from work release and funds received for study release shall be sent to the institution business manager unless the work release coordinator approves other arrangements."

The May 30, 1986 memorandum that informed Waupun inmates of the release account program (a copy of which is appended to the complaint) provides in part as follows:

15% of all general inmate receipts including wages, hobby sales and gifts will be diverted to a segregated release account. The only exceptions are:

(1) Work/Study release money.

(2) Refunds from outside purchases.

(3) Interest earned in a regular savings account.

(4) Money received from other institutions for inmates transferring in.

Nothing in this memorandum supports petitioner's contention that he is discriminated against in relation to all inmates who earn prison wages. The memorandum does not provide that all prison wages are exempt from the 15% requirement; in fact, wages are specifically mentioned as one source of general inmate receipts from which the deduction will be taken. The memorandum does provide that money earned on work and study release is exempt, but this is not the only source of prison wages; prisoners may also earn wages in prison industries (section HSS ch. 324), and in jobs related to the prison's functioning (section HSS 309.55). Thus, petitioner and the group of prisoners whose only source of income is from outside are discriminated against in the use of the canteen only in relation to prisoners whose sole source of income is from work release wages.

■ Petitioner has not alleged any invidious discrimination in the differential treatment, such as discriminatory treatment of a particular racial group. In the absence of an invidious classification, the equal pro-

tection clause requires only that a classification that results in unequal treatment bear some rational relationship to a legitimate state purpose. *French v. Heyne,* 547 F.2d 994 (7th Cir.1976). This standard requires deference to the respondents' decisions unless these decisions are completely unrelated to a legitimate state purpose.

Section HSS 324.09 provides for the handling of funds received by inmates involved in work release programs. Section HSS 324.09(4) sets out a number of inmate financial obligations for which such funds are to be disbursed, in a specified order. These obligations include the inmate's institutional costs, travel expenses, and support for the inmate's family. Work release wages are to be accumulated in the inmate's account only after these and other obligations have been met. I conclude that the state has legitimate interests in seeing that these obligations are met and in avoiding the administrative costs that would be associated with making release account deductions from the accounts of some but not all inmates who earn work release wages, and that the classification is rationally related to these legitimate purposes. Accordingly, petitioner will be denied leave to proceed *in forma pauperis* on his equal protection claim.

#### Order

IT IS ORDERED that petitioner is DENIED leave to proceed *in forma pauperis* on all of his claims.